**Affirmed and Memorandum Opinion filed December 23, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-14-00561-CV

---

## IN THE INTEREST OF V.D.A., A CHILD

---

**On Appeal from the 315th District Court
Harris County, Texas
Trial Court Cause No. 2013-04440J**

---

## M E M O R A N D U M    O P I N I O N

Appellant W.J. (the Father) appeals from the decree terminating his parental rights to V.D.A. (the Child), raising two issues.[1] First, the Father asserts the trial court deprived him of due process by granting termination on a statutory ground the Department of Family and Protective Services (the Department) abandoned before trial. Second, he challenges the sufficiency of the evidence to support termination. We affirm.

---

[1] To protect the identity of the minor, we have not used the names of the Child, parents, or other family members. *See* Tex. R. App. P. 9.8.

# I. BACKGROUND

The Child's mother, A.A. (the Mother), has a history with the Department going back to at least 1996 when she was a teenage mother in the Department's custody. In March 2010, seven of the Mother's other children were removed from her home, which was found in "deplorable condition." The Department initiated proceedings for the protection of the children. The Child at issue here was born after the 2010 proceedings were initiated. The Mother tested positive for cocaine during the pendency of those proceedings, and the Department took the Child into its care in June 2011. In July 2013, the Mother relinquished her parental rights to seven of her nine children, and a termination decree was signed. The Department's termination proceedings concerning the Child at issue here did not reach timely disposition and the case was dismissed July 30, 2013. *See* Tex. Fam. Code § 263.401(a) (requiring dismissal of a suit affecting the parent-child relationship filed by the Department that requests termination of parental rights or that the Department be named conservator of the child when trial has not commenced within the time set out in the statute).

The Department filed a new suit seeking conservatorship of the Child and termination of parental rights on August 1, 2013. When this proceeding was filed, the Father was again named as an alleged father of the Child. Child Advocates, Inc. was appointed guardian ad litem for the Child. The Father's service plan was filed with the court September 25, 2013, before the Father was served with the new suit. The Father was served with process on November 15, 2013, while he was in jail. The Father was serving a six-month sentence in the State Jail Division of the Texas Department of Criminal Justice for tampering with physical evidence. The Father's deferred adjudication probation for this offense was revoked after he plead true to violating the terms of his probation, including testing positive for opiates. On

December 9, 2013, the court again approved the Father's plan and ordered compliance with its terms. In addition, the court ordered DNA testing performed while the Father was incarcerated. The Father's paternity was confirmed in January 2014. On February 5, 2014, the Father filed an answer as "alleged father," including a general denial. On March 3, 2014 the court again approved and adopted the service plan. The record reflects the Father was still incarcerated at that time; he was confined until April 17, 2014.

Trial to the court was held June 9, 2014. At trial, two of the Department's caseworkers, the Child Advocates representative, the Father, the Father's sister (the Aunt), and the foster mother testified. At the conclusion of the trial, the court granted the Department's request for termination of the Father's parental rights. On June 25, 2014, the trial court signed a final judgment reciting that the Father's parental rights were terminated based on findings that termination is in the Child's best interest and that the Father committed acts establishing the predicate termination grounds set out in subsections E and N of Texas Family Code Section 161.001(1).[2] Tex. Fam. Code §§ 161.001(1)(E) & (N); 161.001(2). The Department was appointed sole managing conservator of the Child. The Father filed a timely notice of appeal.

## II. BURDEN OF PROOF AND STANDARDS OF REVIEW

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for

---

[2] The Mother's parental rights to the Child were also terminated, but she did not attend trial and has not appealed.

courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Only one predicate finding under section 161.001 is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at

4

344; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all of the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

## III. ANALYSIS

### A. Section 161.001(1)(N)

In his second issue, the Father asserts the evidence is insufficient to support termination of his parental rights. The trial court found that the Father committed acts establishing the predicate termination ground set out in subsection N of Texas Family Code Section 161.001(1), which provides that a court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has:

> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:
>
> (i) the department or authorized agency has made reasonable efforts to return the child to the parent;
>
> (ii) the parent has not regularly visited or maintained significant contact with the child; and

5

(iii) the parent has demonstrated an inability to provide the child with a safe environment.

Tex. Fam. Code § 161.001(1)(N).

It is undisputed that the Child has been in the Department's conservatorship for more than six months. We first consider whether the Department has made reasonable efforts to return the Child to the Father.

### 1. Reasonable Efforts to Return the Child

The Father was incarcerated for six months during these proceedings. Imprisonment, standing alone, does not constitute constructive abandonment. *In re D.T.,* 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied). Returning a child to a parent under section 161.001(1)(N)(i) does not necessarily mean that the child has to be physically delivered to the individual. *See In re D.S.A.,* 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.) (applying the first prong of subsection N to an incarcerated parent, reasoning that an incarcerated parent may leave the child with a spouse or relative, and the child could accordingly be returned from the Department's custody); *see also In re K.J.T.M.,* No. 06–09–0104–CV, 2010 WL 1664027, at *3 (Tex. App.—Texarkana, April 27, 2010, no pet.) (citing the Department's efforts, "although futile," to place child with relatives as supporting finding of reasonable efforts to return child to incarcerated parent).[3]

A family service plan is designed to reunify a parent with a child who has been removed by the Department. *Liu v. Dep't of Family & Protective Servs.,* 273

---

[3] Some courts have held that the requirement that the Department has made reasonable efforts to return the child to the parent is inapplicable when the parent is incarcerated. *See, e.g., In re A.Q.W.,* 395 S.W.3d 285, 287 (Tex. App.—San Antonio 2013, no pet.); *In re D.T.,* 34 S.W.3d at 633. We have not followed these cases. *See, e.g. In re A.S.,* 261 S.W.3d 76, 90 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

S.W.3d 785, 795 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Implementation of a family service plan by the Department is considered a reasonable effort to return a child to its parent. *In re N.R.T.,* 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.); *see also In re M.R.J.M.,* 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.) (holding that the State made reasonable efforts to return the child to the parent under section 161.001(1)(N) when it prepared several service plans for the parent and made special arrangements for him to attend parenting classes near his home and to transport him to his psychological assessment); *In re K.M.B.,* 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.) (holding the State showed that it made reasonable efforts to return the child to the parent when it prepared service plans and made efforts to work with the parent on the service plans).

The Department prepared a family plan of service for the Father and filed it with the court. The court later approved the plan and ordered the Father to comply with it. The Father's family service plan required him to:

> Provide proof of sufficient income to support himself and the Child, including pay stubs or letters from his employer each month;
>
> Maintain stable housing for at least six months and provide proof of housing to the Department;
>
> Remain in contact with the Department for the duration of the case, including contact at least once a month;
>
> Attend all court hearings, meetings, and visits related to the case;
>
> Submit to DNA testing to establish paternity within 14 days of the court order;
>
> Refrain from illegal activity;
>
> Submit to random drug tests; No-shows will be considered a positive result;
>
> Complete a substance abuse assessment within two months of service; and

Complete a psychosocial evaluation within two months of service, and follow all recommendations.

The Department mailed the Father the family service plan in September, 2013, nine months before trial. Meredith Atkinson testified that she had been the Department's caseworker for this case from June, 2011 to the end of September, 2013. Although Atkinson acknowledged she had not spoken with the Father in person, she testified that she had attempted to contact the Father by mail during the time she worked on the case. Atkinson testified she mailed the plan to the Father at least twice and went over it with him on the phone. Atkinson testified she made two additional attempts to contact the Father before she was reassigned to another position. Before sending the service plan, she spoke to the Father's grandmother, and it was Atkinson's understanding that the Father resided with her. The grandmother provided the address used to mail the service plan. Atkinson testified that the family service plan was sent certified mail in September, 2013, before the Father was sent to the State Jail. The Department provided a signed return receipt card showing the Father had received a copy of his service plan, although Atkinson acknowledged that the signature did not appear to be the Father's. Atkinson also sent the Father a letter in August, 2013, notifying him he was the alleged father of the Child and requesting that he contact the Department and arrange to take a DNA test. She sent a second letter to the grandmother's home.

Alina Jones testified that she was the Department's conservatorship caseworker for this case from November, 2013 to the time of trial. She testified she attempted to contact the Father in November, 2013 after the status hearing. She stated she mailed the Father's service plan to him at the State Jail facility in November. Jones testified that she also faxed the service plan to the Father's court-appointed attorney in December, 2013. On cross-examination, the Father's attorney provided a document requesting a copy of the family service plan much

8

later, on May 13, 2014, and Jones acknowledged she had received the request. Jones also testified she made telephone calls to the Father after he was released from jail, and she went over the service plan with the Father on the phone. It was Jones's understanding that the Father had received a copy of the plan. Jones explained that this case was re-filed after the previous case was dismissed. In the earlier case filed in 2011, the Father was also named as the alleged father of the Child. In addition, the Father was named as the alleged father of an older sibling.

Jones also testified the Father has not completed the tasks set out in his family service plan. Jones testified the Father was unable to meet the service plan requirement to attend all court hearings, meetings and visitation because he was incarcerated for six months of the nearly one-year period the case was pending. The Father was also unable to complete a substance abuse assessment within the required time period because he was incarcerated. Jones concluded that the Department's efforts were reasonable, the requirements set out in the service plan were reasonable, and the Father could have completed the tasks if he had not been incarcerated.

Jones testified that after the Father was released from confinement in April, 2014, she contacted the Aunt, who provided the Father's telephone number. Jones called the Father and spoke to him. The Father did not contact her until about two weeks before the June trial. At that time the Father sought to make arrangements for a psychosocial evaluation, which he completed shortly before trial. The service plan, incorporated in the trial court's order, required the Father to follow all recommendations made in the psychosocial assessment, which included eight to ten sessions of individual counseling. These sessions had not begun by the time of trial.

Jones testified she contacted the Father on May 6, 2014 to arrange for a

urinalysis, as required by the service plan. The Father did not submit to the test, and informed her after the scheduled date that he had not received the necessary information. Jones testified she contacted the Father by telephone and instructed him to go to the National Screening Center for another drug test on May 22, 2014. The Father submitted to the May 22 drug test, and the results were negative.

The Father testified at trial and he denied knowing that the Child had been in the Department's care since 2011. He also blamed his lack of involvement in these proceedings on the Department's failure to contact him because he was incarcerated for six months during the pendency of this case. The record reflects that on July 6, 2012, the Father entered a plea of guilty to the offense of attempted tampering with physical evidence, namely phencyclidine. As part of an agreement with the State, the Father was placed on deferred adjudication probation for two years and assessed a $500 fine. The State subsequently moved to adjudicate the Father's guilt, alleging he tested positive for opiates and committed other violations of the terms of his probation. On October 29, 2013, the Father was sentenced to six months in the State Jail Division of the Texas Department of Criminal Justice, after pleading true to the allegations in the motion to adjudicate his guilt. The Father testified he does not even know what phencyclidine is; he asserted that he was charged with a co-defendant and the drugs belonged to the co-defendant. The Father testified he was incarcerated on October 21, 2013, and released from the state jail facility on April 17, 2014. The Father testified that he preferred to serve the six-month sentence because he wanted to "get it over with" so he could travel outside the state without violating the terms of his probation. The Father explained that he wanted to be released from the probation requirement forbidding travel out of state so he could work as a commercial 18-wheel truck driver, which had been his employment before he was placed on probation.

The Father denied that the State moved to adjudicate his guilt. On cross-examination, when confronted with a copy of the State's motion and the allegation that he tested positive for opiates, specifically oxycodone/oxymorphone, on July 9, 2013, the Father acknowledged that the allegation was true. He claimed he had a prescription for the drug and showed it to the probation officer. He also claimed that when he decided he preferred to serve the six-month sentence, he stopped performing his probation requirements. The motion to adjudicate also alleged that the Father used phencyclidine (PCP). The Father admitted that he used PCP, and it was a violation of the terms of his probation. The Father ultimately admitted that all of the allegations in the State's motion were true and he violated the terms of his probation.

The Father denied any knowledge about a service plan; he denied receiving the plan or discussing it with the caseworkers. The Father testified that he had never spoken with either caseworker about a family service plan. He testified he had undergone a psychosocial assessment, but he is unaware of other tasks he is required to perform.

The trial court resolved this credibility dispute about the Father's receipt of the service plan and contact with the caseworkers, and we may not disturb its determination. There were many inconsistencies in the Father's testimony. It was within the trial court's discretion to determine the weight and credibility of the Father's testimony. *See In re K.A.S.*, 131 S.W.3d 215, 229–30 (Tex. App.—Fort Worth 2004, pet. denied). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re H.R.M.*, 209 S.W.3d at 108. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

Moreover, this court has held that the evidence was sufficient to support a finding that the Department made reasonable efforts to return the child to the parent, even though the father in the earlier case claimed the caseworker did not go over the plan with him. *See In re G.S.*, No. 14-14-00477-CV, 2014 WL 4699480, at *10 (Tex. App.—Houston [14th Dist.] Sept. 23, 2014, no. pet.) (mem. op.). In *G.S.,* the Father signed his service plan almost a year before trial, recitations in the plan reflected the Father participated with the caseworker in preparing the plan, the second caseworker set up visits and arranged services, and the Father did not raise his complaints to the trial court that the first caseworker failed to go over the plan with him and delayed in scheduling services. *Id.* at *9; *see also In re B.S.T.,* 977 S.W.2d 481, 486 (Tex. App.—Houston [14th Dist.] 1998, no pet.), *overruled in part on other grounds by In re C.H.,* 89 S.W.3d 17 (Tex. 2002) (holding the evidence was sufficient to support termination under subsection N when, after release from prison, the defendant was advised of visitation but only visited with his children twice and made no further efforts to be involved with them, and a caseworker testified that all reasonable efforts were made to return the children to the parents).

On June 9, 2014, the Father made an oral motion for continuance prior to the beginning of trial. The Father's counsel argued that the Father was not served until November, DNA testing was performed in December, and the Father and his counsel did not learn of the DNA results until January. The Father requested additional time to complete his services. In response, the Department and the attorney ad litem for the Child argued that counsel was appointed in December, the Father was released from incarceration in April, and the Father should have moved for a continuance earlier, instead of the day of trial. While the Father has not expressly challenged the denial of a continuance, to the extent the denial impacted

his ability to comply with court-ordered services, we conclude the trial court did not abuse its discretion in denying an oral motion for continuance, unsupported by verification or an affidavit. *See In re E.L.T.*, 93 S.W.3d 372, 375 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (citing Tex. R. Civ. P. 251).

We agree with the Department's contention that it was the Father's own actions that caused his incarceration and delayed his involvement in the case. The Department made several attempts to contact the Father before he was incarcerated. After he went to jail, the Department tracked him down and obtained service and a DNA test while he was incarcerated. Both caseworkers testified to their efforts to provide the Father a copy of the service plan and work with him in completing the required services. The Department used due diligence to locate the Father in State Jail, have him served within two weeks of his incarceration, and have DNA testing completed shortly thereafter. As soon as the Department learned of the Father's release from jail, it arranged his psychosocial evaluation and urinalysis. Accordingly, we conclude the evidence supports a finding that the Department made reasonable efforts to return the Child to the Father. *See In re K.M.B.,* 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.) (holding the State showed that it made reasonable efforts to return the child to the parent when it prepared service plans and made efforts to work with the parent on the service plans).

### 2. The Father's Contacts with the Child

The Father was incarcerated for six months of the almost one-year period this case was pending. The Father used his incarceration as an excuse for failing to visit the Child. As discussed above, the Department responded that the Father's incarceration resulted from his own actions. The Father acknowledged he was aware that the Mother alleged he was the Child's biological father before this case

was initiated, yet he had no contact with the Child before his incarceration.

Caseworker Jones testified the Father has never visited the Child or sent any letters or cards. He also has not made any phone calls to the Child. The Father never asked for any photographs of the Child. He has not offered any support for the Child, and none of the Father's family members have offered support. The Father has not provided proof that he is able to support himself and the Child. Jones testified the Father told her he was presently living with his mother. In his subsequent testimony, the Father confirmed that he resides with his mother. The Father has not provided a lease, deed, or any other documentation to show that he has a right to live at the residence. Jones explained that without documentation, the Department does not consider that the Father has provided proof of stable housing. Jones testified the Father has had at least three addresses throughout the pendency of this case. Jones also testified the Father failed to keep in regular contact with the Department during the pendency of the case.

The Father testified that he had a "one night stand" with the Mother, although there was testimony that he is alleged to be the Father of another of the Mother's children. He testified that before this case was filed, shortly after the Child was born, he asked the Mother for DNA testing when he first learned he might be the Child's father. He testified she was "nonchalant about the situation," leaving him with the impression that the baby probably was not his. Despite this discussion, the Father then testified he had no way to contact the Mother about seeing the Child before he was notified about this case. The Father testified he was not involved in the 2011 investigation shortly after the Child's birth. He denied any knowledge about the Mother's lifestyle or the conditions in which the Child lived before the Department removed him from the Mother's care. The Father testified that when he was contacted in this case about possibly being the Child's father, he

14

again requested a DNA test. He submitted to testing while he was in Plane State Jail. On cross-examination, the Father admitted that he knew it was possible that he was the Child's biological father before the Department took custody of the Child, yet he took no action to see the Child or provide support.

Atkinson acknowledged that she was aware that the Father had requested DNA testing and he had stated that he believed that he was not the biological father of the Child. Yet the Father did not contact the Department to arrange DNA testing before he was incarcerated. When the Father was served in November 2013, he did not contact the Department. The Department obtained an order requiring DNA testing, and the results confirming the Father's parentage were received in January 2014. When the DNA testing confirmed the Father's paternity, the Father did not contact the Department. After he knew his paternity had been confirmed, he filed an answer and general denial in this suit as an "alleged" father. The Father did not request in his pleading that he be declared the Child's father or seek any relief with respect to the Child. The Father did not provide for the Child after his paternity was confirmed. The Father did not contact the Department when he was released from jail in April. Caseworker Jones contacted the Aunt at the beginning of May, after the Father had been released from the state jail facility the month before, and obtained a telephone number for him.

Jones testified the Father showed no interest in the Child until shortly before trial. She stated the Father requested visits with the Child for the first time "within the last couple of weeks." The Father first asked to visit the Child about May 20 or 21, less than three weeks before trial, when Jones called to set up the Father's urinalysis. The Department did not recommend visitation at that time because it was so close to trial, the Child does not know the Father, and it would be disruptive.

15

In sum, the Father has had no contact with the Child. Even though the Child was four at the time of trial, the Father did not attempt to speak with him on the telephone or to send him cards or letters that could have been read to the Child. The Father never asked about the Child's placement or where he lived. The Father has not paid any child support or provided any other support, and he never visited the Child.

We conclude the evidence supports the finding that the Father has not regularly visited or maintained significant contact with the Child. *See In re K.G.*, 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied) (upholding termination based on subsection N where mother failed to visit child after service of citation); *In re J.J.O.,* 131 S.W.3d 618, 628–29 (Tex. App.—Fort Worth 2004, no pet.) (holding the evidence legally and factually sufficient to support finding that mother had not regularly visited or maintained significant contact with the child when mother made only twelve visits during a nine-month period, was late to visits, and sometimes failed to interact with the child); *see also M.C. v. Dep't of Family & Protective Servs.,* 300 S.W.3d 305, 310 (Tex. App.—El Paso 2008, pet. denied) (holding that mother did not regularly visit or maintain significant contact with the child when she visited only six to eight times in a twelve-month period and when mother attended visitations, she remained quiet and showed no emotion.); *In re H.R.*, 87 S.W.3d 691, 699 (Tex. App.—San Antonio 2002, no pet.) (holding evidence was legally and factually sufficient to support constructive abandonment where evidence reflected only intermittent visits).

### 3. The Father's Ability to Provide a Safe Environment

Jones testified that the Father had not informed her of any plans to show that he can provide the Child with a safe and stable environment. The only plan he described was "to work and to live with his sister until he got himself together."

16

Jones testified the Father lacks stability and he has not shown he can care for this four-year-old Child. Jones further testified the Father has not provided proof of income, although he told her he was employed. The Father later testified he works as a tree climber at Lockridge Services and makes $650 per week in "take-home pay," but he provided no documentation to support his income.

On cross-examination, Jones acknowledged that the Department became involved with the Child because of the Mother's actions, and not because of anything the Father had done. Jones also acknowledged that two months after his paternity was established, the Father provided information about the Aunt as a possible placement for the Child. Jones stated that a home study was performed and the Aunt's home was approved. Jones explained that the Department did not receive the home study report until mid-April 2014, and the Department's position was that it would not be beneficial to change the Child's placement so close to trial, which was scheduled in less than six weeks.[4] Jones also acknowledged on cross-examination that she was aware the Father has other children, but she believed it was not important for the Child to know those older siblings.

The Father testified that he learned he was the Child's biological father when his attorney wrote to him in January or February, while he was still incarcerated. He stated he was happy about the discovery and wanted to be in the Child's life. The Father testified that he did not send anything to the Child because he had no way to contact him. He acknowledged that he made no inquiries about how to contact a child in the Department's custody. He stated he has no knowledge about how the child-protection system works. The Father testified he has four

---

[4] On April 24, 2014, the Father filed a motion requesting a special status hearing to address the possibility of placing the Child with the Aunt. The record indicates that a hearing was set for May 12, 2014, but no record of a hearing was filed and no order on the Father's motion is contained in the record.

children and he always took care of them. The Father stated he contacted his sister to attend court once when he was brought to court on a bench warrant. He testified he called caseworker Jones after he was released from the State Jail facility. He said she did not give him an explanation why he could not see his Child. The Father testified that he wants to form a relationship with the Child. He testified that he has informed his other children about the Child, and they would also like to have a relationship with the Child.

The Father testified he never abused or neglected any child. He has a great relationship with his other children. His oldest child is 21, and the others are 18 and 17. The children were with the Father's wife while he was incarcerated. The Father testified he has been a father figure for his oldest child and supported all of his children financially. The Father stated that caseworker Jones never asked him about his plans to be a part of the Child's life.

The Father testified he has four sisters and one brother. He and his attorney submitted the Aunt's name as a possible placement for the Child while he was incarcerated. The Father testified he would pay for daycare for the Child if he was awarded custody, but he had not made any arrangements. He had not investigated any pre-Kindergarten programs. He acknowledged that he does not know anything about the Child.

An incarcerated parent may provide a safe environment for a child through family members. *See In re N.R.T.*, 338 S.W.3d at 674 (finding Department's rejection of each of the suggested placements supported finding that no family member could provide a safe environment for the child while the mother was incarcerated). Although the Aunt's home was approved after a home study, she had never seen the Child, and it was determined that it was too disruptive to change the Child's placement shortly before trial.

While the record contains some evidence that the Father had been a good parent to his older children, there was no evidence about his present ability to care for a young child. The Father did not provide proof of income or stable housing, as required in his court-ordered service plan. He testified he was living with his mother, but there was no indication whether he planned to stay there. He did not have any plans for the Child's care, particularly when he travelled out-of-state while working as a commercial truck driver. This evidence supports a finding that the Father lacked the ability to provide a safe environment for the Child. *See In re T.M.,* No. 02–09–145–CV, 2009 WL 5184018, at \*4–\*5 (Tex. App.—Fort Worth Dec. 31, 2009, pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support inability to provide safe environment finding when father failed to complete service plan, did not attempt to find a place for children to live, and did not give foster mother money to care for children). The failure to complete a family service plan demonstrates an inability to provide a child with a safe environment. *See In re A.D.*, 203 S.W.3d 407, 411–12 (Tex. App.—El Paso 2006, pet. denied).

In an earlier case, this court found the Department did not meet its burden to show evidence that the parent has demonstrated an inability to provide the child with a safe environment in *In re A.S.*, 261 S.W.3d at 90. In *A.S.,* the incarcerated father had two siblings who sought placement of the children, and there was no evidence the Department followed up with home studies. Here, the Department had a home study prepared on the Aunt's home, but it was too close to trial to implement a change in the Child's living arrangements. In addition, in *A.S.*, the record reflected the father's brother visited the children often. *Id.* Here, none of the Father's family members visited the Child while he was incarcerated or after his release; there is no evidence any of the Father's family had ever seen the Child. In

*In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.), this court affirmed the termination of parental rights based on subsection N. We cited the mother's history of a failure to maintain stable housing, her poor judgment concerning the children's welfare, her failure to complete her court-ordered services to obtain the return of her children, and her failure to regularly visit or provide any support for her three youngest children as sufficient evidence of constructive abandonment. *Id.* at *13.

In sum, under the applicable standards of review, the record evidence is legally and factually sufficient to support the finding that the Father constructively abandoned the Child pursuant to section 161.001(1)(N). Reviewing all the evidence in the light most favorable to the termination findings, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the termination findings under section 161.001(1)(N). In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the termination finding under section 161.001(1)(N) is not so significant that a fact finder could not reasonably have formed a firm belief or conviction as to the truth of the termination finding under section 161.001(1)(N). *See In re H.R.M.*, 209 S.W.3d at 108. We overrule this portion of the Father's second issue.

In the Father's first issue, he claims the Department announced in court what amounted to a stipulation that it abandoned subsection E, endangering conduct, as a ground for termination.[5] *See* Tex. Fam. Code § 161.001(1)(E). Because a single predicate finding under section 161.001(1) of the Family Code is sufficient to support a judgment of termination when there is also a finding that termination is

---

[5] We note that the claim in the Father's first issue is not supported by the record. The record of pretrial proceedings contains no such stipulation. At one point during the hearing, in response to a relevance objection to a question about the dangerous conditions in which the Child was found, the Department's counsel stated, "We are proceeding on (D) and (E) grounds." Therefore, it was clear the Department had not abandoned endangerment grounds.

in the child's best interest, we need not address the Father's first issue. *See In re A.V.*, 113 S.W.3d at 362 (affirming termination decree based on one predicate without reaching second predicate found by fact finder and challenged by appellant); *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (same).

## B. Best Interest

The Father also argues that the evidence is insufficient to support the finding that termination of his parental rights is in the best interest of the Child. We review the entire record in deciding a challenge to the court's best interest finding. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d at 533. Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a).

Courts may consider the following nonexclusive factors in reviewing the sufficiency of the evidence to support the best interest finding, including: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive, and evidence is not required on all of the factors to support a finding terminating parental rights. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. Tex. Fam. Code § 263.307(b); *In re R.R.,* 209 S.W.3d at 116.

**1. Danger to the Child, Including Parental Drug Use and Criminal Activity**

The Father admitted using hydrocodone on April 8, 2013, and to using PCP on November 5, 2012. In addition, he was convicted of a drug-related offense. A parent's drug use supports a finding that termination is in the best interest of the child. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.); *see also In re J.N.H.*, No. 02–11–00075–CV, 2011 WL 5607614, at *8 (Tex. App.—Fort Worth Nov. 17, 2011, no pet.) (mem. op.) (considering a parent's criminal and drug histories in affirming a trial court's decision that termination was in the best interest of a child). The Father also acknowledged that he failed to follow the rules of his community supervision.

The Child Advocate testified she was concerned about the Father's drug use. The criminal charges for which he was sent to State Jail were related to illegal drug

use. The Child Advocate opined that even if the drugs were not the Father's, he was associating with drug users. In addition, the Father plead true to the allegations in the motion to adjudicate his guilt, and one of the allegations was that he had tested positive for hydrocodone.

The record contains some evidence tending to negate the Father's drug use. The Father submitted to a drug test in May, 2014, and the results were negative. The Aunt testified that she had never seen her brother under the influence of drugs. She stated he is not known to be a drug addict. She explained that the Father admitted to violating the terms of his probation so that he could serve his sentence and be permitted to drive a truck out of state.

It was within the trial court's discretion to determine the weight and credibility of this testimony, and we are not to rely on evidence that is disputed or that the court could have rejected as not credible. *See In re L.M.I.*, 119 S.W.3d at 712; *In re A.J.E.M.-B.*, No. 14-14-00424-CV, 2014 WL 5795484, at \*14 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.) (stating the trial court, as the factfinder, was entitled to disbelieve the Mother's testimony denying her drug use and rely on other evidence in holding termination was in the best interest of the child). After considering all the evidence related to this factor, the trial court reasonably could have formed a firm belief or conviction that the Father used drugs and termination is in the best interest of the Child. *See Walker v. Texas Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 618–19 (Tex. App.— Houston [1st Dist.] 2009, pet. denied).

## 2. Stability and Compliance with Services

Stability and permanence are paramount in the upbringing of children. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). A parent's failure to show that he is stable enough to parent a child for any prolonged

period entitles the trial court "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.).

The evidence of the Father's failure to complete the requirements of his court-ordered service plan is recited above. It was appropriate for the court to consider that the Father did not comply with the court-ordered service plan for reunification with the Child in evaluating the Child's best interest. *See In re E.C.R.*, 402 S.W.3d at 249 (stating the failure to comply with court-ordered services can support best-interest finding); *In re E.A.F.,* 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. granted) (considering failure to participate in services required for reunification in reviewing best-interest determination).

The Child Advocate testified about the report she filed with the court. She recommended both parents' rights be terminated. As to the Father, she testified he had not provided proof of safe and stable living arrangements or completed the other required services. The Child Advocate acknowledged on cross-examination that she had not had any interaction with the Father.

### 3. Child's Desires, Needs, and Proposed Placement

The Child was very young at the time of trial and there is no evidence of his desires. When a child is too young to express his desires, the factfinder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The Child Advocate testified about how well the Child is doing in the foster home. The Child Advocate testified the Child has been in his current placement for

two years, almost half of his life. He is thriving and bonded to his caregiver. He is in an adoptive home where his brother was in the process of being adopted. The Child is very close to his brother — they are "inseparable." He also has regular contact with his other siblings. The siblings live nearby, visit regularly, and they have bonded with the Child. The Child has improved greatly in his language skills and behavior while in the foster home.

Caseworker Atkinson testified about her involvement in this case from June, 2011 to the end of September 2013. Atkinson visited the Child monthly while he was in foster care, and she saw him "blossom." She testified the Child is currently in a stable environment with regular access to his siblings. The Child has been in the same foster home with one of his older siblings for two years. Atkinson stated the foster mother is in the process of adopting the sibling and would like to adopt the Child. In Atkinson's opinion, the foster home provides a safe and stable environment for the Child, and it is in the Child's best interest to remain in the foster home.

Caseworker Jones also testified the Child's foster mother would like to adopt him. Jones testified that the foster mother was in the process of adopting the older brother, and described the close relationship the Child has with his older brother. Jones testified that the Child just had his fourth birthday, and he has no relationship at all with his biological father; the Child does not know the Father. Jones testified that it is the Department's position that the Child will "be best suited in a permanent placement where he can have extended access with his siblings, a stable environment, access to education, and able to have all of his overall well-being needs met" through adoption by his foster mother. Jones testified that in her opinion, it would be in the Child's best interest to terminate the Father's parental rights.

The foster mother testified at trial that she wants to adopt the Child. She stated the Child had been with her since he was in diapers. When he was first placed in her care, he was small and diagnosed with "failure to thrive." The foster mother testified she worked with the caseworkers and the school district to obtain speech therapy to help the Child with his delayed speech. The foster mother further testified the Child is "a good kid, fun loving." Her older daughter is attached to the Child. The foster mother stated the Child has bonded with her entire family, including grandparents. The Child has chosen a different name and wants to be called his new name. The family travels a lot and is engaged in numerous activities. The foster mother testified that she considers the Child her son, stating "He's — for me, he's mine." She further testified, "We have a great life. He has a normal life."

The Child has been in his current placement for two years, almost half of his life. He is thriving and bonded to his caregiver. The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest. *See J.N.R.,* 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best-interest determination. *See In re K.C.*, 219 S.W.3d at 931. Therefore, evidence about the present and future placement of the Child is relevant to the best interest determination. *See C.H.*, 89 S.W.3d at 28.

In contrast, there was no evidence that the Father could provide for the Child's needs. He had been incarcerated for six months during these proceedings. While imprisonment alone is not a basis to terminate a parent's rights, it is an appropriate factor to consider. *In re M.R.J.M.*, 280 S.W.3d at 503. When a parent is incarcerated, he is absent from the child's daily life and unable to provide support

26

to the child, negatively impacting the child's living environment and emotional well-being. *Id.* Caseworker Atkinson testified that a parent's incarceration is not supportive of the child's physical or emotional needs because a parent who is incarcerated cannot provide for any of the child's needs.

The record evidence on these factors supports the trial court's best-interest finding.

### 4. Parenting Abilities and Family Support

We may also consider the Father's past performance as a parent in evaluating his fitness to provide for the Child and the trial court's determination that termination of his parental rights would be in the Child's best interest. *See In re C.H.*, 89 S.W.3d at 28. The Father testified that he had provided for his older children and was a "role model" for the oldest. The Aunt testified that she has seen the Father interact with his other four children and he is a good father. She stated he is involved with his children; he disciplines them when they misbehave, but he does not abuse or hurt the children. She testified that if the Father's rights were not terminated she would be a support system to assist him in establishing a relationship with the Child. While the Aunt testified that some of the Father's other four children had lived with him in the past, she did not know where they are living now. She admitted she did not know the names and ages of all of the Father's children and had not seen all of them. She did not know how often the Father sees his other children. The trial court, as the factfinder, evaluated the credibility and weight of the Aunt's testimony on this issue, and we may not disturb that determination.

Evidence that a parent has failed to maintain any significant contact with the Child supports a trial court's determination that termination is in the child's best interest. *See H.N. v. Dep't of Family & Protective Servs.*, 397 S.W.3d 802, 814

(Tex. App.—El Paso 2013, no pet.). On the other hand, the evidence of the foster mother's parenting abilities and family support is recited above. While there is evidence in the record that the Father had been a good parent in the past, this evidence does not outweigh the other evidence supporting a finding that termination of the Father's parental rights is in the Child's best interest.

In sum, the record contains evidence supporting the best interest finding based on the Father's drug use, lack of contact with the Child, and failure to comply with court-ordered services. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (considering the parent's drug use, inability to provide a stable home, and failure to comply with his family service plan in holding the evidence supported the best interest finding).

Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of the Father's parental rights is in the Child's best interest. *See J.F.C.*, 96 S.W.3d at 265–66. In light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the best interest finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that termination of the Father's parental rights is in the Child's best interest. *See In re H.R.M.*, 209 S.W.3d at 108. Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the Child's best interest. *See* Tex. Fam. Code § 161.001(2). We overrule the remainder of the Father's second issue.

## IV. CONCLUSION

We have determined that legally and factually sufficient evidence supports the trial court's findings of the predicate ground under section 161.001(1)(N) and

that termination of the Father's parental rights is in the best interest of the Child. Therefore, the trial court's judgment is affirmed.


/s/     Ken Wise
Justice


Panel consists of Justices McCally, Brown, and Wise.